UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN BOSCO, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>CANOPY GROWTH CORPORATION, MARK ZEKULIN, BRUCE LINTON, MIKE LEE, and TIM SAUNDERS,<br><br>        Defendants. | Case No.<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Steven Bosco ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Canopy Growth Corporation ("Canopy" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Canopy securities between September 8, 2017 and November 13, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Canopy is headquartered in Smiths Falls, Canada.  The Company was formerly known as Tweed Marijuana Inc. and changed its name to Canopy Growth Corporation in September 2015.  Canopy, together with its subsidiaries, engages in the production, distribution, and sale of cannabis in Canada.

3.     Canopy shares began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "CGC" on May 24, 2018, before which the Company's shares traded publicly under the ticker symbol "WEED" on the Toronto Stock Exchange ("TSX"), and under the ticker symbol "TWMJF" on the OTC Pink market ("OTC").  The Company's common shares on the OTC continued to trade until market close on May 23, 2018, after which those shares began trading under the ticker symbol "CGC" on the NYSE.  The Company's common shares continue to trade on the TSX.

4.     Canopy operates through two segments—Cannabis Operations and Canopy Rivers.  The Company's products include dried flowers, oils and concentrates, softgel capsules, and hemps. It offers its products under the Tweed, Spectrum, DNA Genetics, CraftGrow, Tokyo

Smoke, DOJA, Van der Pop, and Maitri brands.  The Company also provides growth capital and a strategic support platform that pursues investment opportunities in the global cannabis sector.

5.     On April 13, 2017, the Canadian Federal Government tabled legislation (Bill C-45), which aimed to legalize regulated recreational cannabis in Canada.  On June 19, 2018, Bill C-45 passed the final vote in the Senate, opening the door to recreational retail sales of cannabis throughout Canada upon final approval and regulatory hurdles.

6.     Following passage of Bill C-45, provinces of Canada announced either that their respective provincial liquor control agencies would oversee the distribution and retail of non-medicinal cannabis, or that their respective provincial liquor control agencies would be responsible for distribution and oversee the private retail of non-medicinal cannabis.

7.     According to Canopy's SEC filings, the Canadian recreational market launched on October 17, 2018.

8.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Canopy had exaggerated and/or overestimated the potential market for its products in Canadian retail stores; (ii) as a result, Canopy had failed to properly account for inventory and demand for its products, leading to inventory write-offs and restructuring charges; (iii) all of the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

9.     On November 14, 2019, Canopy announced its financial results for the second quarter of fiscal year 2020, which ended on September 30, 2019 (the "2Q20 Press

Release").  Among other results, the 2Q20 Press Release reported revenue that fell below the lowest analyst estimate and an EBITDA loss of C$155.7 million, which one analyst described as "astounding."  The 2Q20 Press Release further advised investors that it was unlikely to meet its previous revenue guidance of C$250 million by the fiscal fourth quarter.  As explained by Canopy's Chief Executive Officer ("CEO"), Mark Zekulin ("Zekulin"), "provinces have reduced purchases to lower inventory levels, retail store openings have fallen short of expectations, and Cannabis 2.0 products are yet to come to market."  The 2Q20 Press Release further advised that, "[a]s part of a management-initiated portfolio review, the Company has taken a restructuring charge of $32.7 million for returns, return provisions, and pricing allowances primarily related to its softgel & oil portfolio"; "recorded an inventory charge of $15.9 million to align the portfolio with the new strategy"; and that "[t]he Q2 2020 gross margin impact of the portfolio restructuring costs is $40.4 million."

10.     On this news, Canopy's stock price fell $2.66 per share, or 14.38%, to close at $15.84 per share on November 14, 2019.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Canopy securities trade on the NYSE located within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

16.     Plaintiff, as set forth in the attached Certification, acquired Canopy securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Canopy is organized under the laws of Canada with principal executive offices located at 1 Hershey Drive, Smiths Falls, Ontario K7A 0A8, Canada.  Canopy securities trade in an efficient market on the NYSE under the ticker symbol "CGC."

18.     Defendant Zekulin served as Canopy's President since before the start of the Class Period until June 27, 2018, when he was additionally named Co-CEO of the Company.  He served in this capacity until July 3, 2019, when he became sole CEO of the Company.  Following Zekulin's transition to sole CEO, he stepped down as Canopy's President.  Zekulin announced his intention to leave the Company within the calendar year following the release of the 2Q20 Press Release.

19.     Defendant Bruce Linton ("Linton") is the founder of Canopy, and served as the Company's Chairman and CEO since before the start of the Class Period until June 27, 2018,

when he became Co-CEO of the Company.  He served in this capacity until July 3, 2019, when

he stepped down from this role, which, according to Linton, was a forced resignation.

20.     Defendant Mike Lee ("Lee") served as Canopy's Acting Chief Financial Officer

("CFO") since June 1, 2019, and thereafter has served as CFO on a permanent basis.

21.     Defendant Tim Saunders ("Saunders") served as Canopy's Executive Vice-

President and CFO since before the start of the Class Period until June 1, 2019.

22.     Defendants Zekulin, Linton, Lee, and Saunders are sometimes referred to herein

as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the

contents of Canopy's SEC filings, press releases, and other market communications.  The

Individual Defendants were provided with copies of Canopy's SEC filings and press releases

alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions

with Canopy, and their access to material information available to them but not to the public, the

Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

were being concealed from the public, and that the positive representations being made were

then materially false and misleading.  The Individual Defendants are liable for the false

statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Canopy is headquartered in Smiths Falls, Canada.  The Company was formerly

known as Tweed Marijuana Inc. and changed its name to Canopy Growth Corporation in

September 2015.  Canopy, together with its subsidiaries, engages in the production, distribution, and sale of cannabis in Canada.

25.    Canopy shares began trading on the NYSE under the ticker symbol "CGC" on May 24, 2018, before which the Company's shares traded publicly under the ticker symbol "WEED" on the TSX, and under the ticker symbol "TWMJF" on the OTC.  The Company's common shares on the OTC continued to trade until market close on May 23, 2018, after which those shares began trading under the ticker symbol "CGC" on the NYSE.  The Company's common shares continue to trade on the TSX.

26.    Canopy operates through two segments—Cannabis Operations and Canopy Rivers.  The Company's products include dried flowers, oils and concentrates, softgel capsules, and hemps. It offers its products under the Tweed, Spectrum, DNA Genetics, CraftGrow, Tokyo Smoke, DOJA, Van der Pop, and Maitri brands.  The Company also provides growth capital and a strategic support platform that pursues investment opportunities in the global cannabis sector.

27.    On April 13, 2017, the Canadian Federal Government tabled legislation (Bill C-45), which aimed to legalize regulated recreational cannabis in Canada.  On June 19, 2018, Bill C-45 passed the final vote in the Senate, opening the door to recreational retail sales of cannabis throughout Canada upon final approval and regulatory hurdles.

28.    Following passage of Bill C-45, provinces of Canada announced either that their respective provincial liquor control agencies would oversee the distribution and retail of non-medicinal cannabis, or that their respective provincial liquor control agencies would be responsible for distribution and oversee the private retail of non-medicinal cannabis.

29.    According to Canopy's SEC filings, the Canadian recreational market launched on October 17, 2018.

**Materially False and Misleading Statements Issued During the Class Period**

30.     The Class Period begins on September 8, 2017, when Canopy issued a press release during pre-market hours, entitled "Tweed Farms to expand three-fold to over one million square feet of greenhouse space under glass," announcing that the Company "ha[d] finalized the purchase of a parcel of land adjacent to its current facility in Niagara-on-the-Lake, ON including an operational 458,000 sq. ft. greenhouse" (the "September 2017 Pre-Market Press Release"). Defendant Linton, as quoted in that press release, touted that the Company "see[s] a ***long-term need for a diversified and <u>exponentially larger</u> footprint here in Canada*** balancing indoor and greenhouse growing platforms," and that "[e]xpanding the production capacity and greenhouse space at Tweed Farms allows us to ***continue to grow into the demand in the market***, and showcase our best-in-class sun-grown products."[1]

31.     The September 2017 Pre-Market Press Release also touted that Canopy's wholly-owned subsidiary, Tweed Farms, Inc. ("Tweed Farms"), would "continue to grow and harvest a variety of genetics to support ***growing demand for dried flower, oil, and Softgel capsule cannabis products***."

32.     Later that day, after market-close, Canopy issued another press release responding to the Ontario government's announcement concerning its retail cannabis framework (the "September 2017 After-Market Press Release").  That press release asserted that the Company would need to expand its production capacity and "fill store shelves" to capitalize on the demand that Ontario's retail cannabis framework would create.  Citing the September 2017 Pre-Market Press Release issued that morning, the Company assured customers that it had taken steps in the

---

[1] All emphases are added, unless specified otherwise.

right direction to meet this purported challenge.  Specifically, the September 2017 After-Market

Press Release stated, in relevant part:

> Following the Ontario provincial government's announcement of a framework for
> legal cannabis sales and use, Canopy . . . would like to offer the following
> statements:
>
> * * *
>
> - We are currently Canada's largest producer, and are **committed to
>   expanding throughout the coming years to meet the demand this system
>   will create** . . . . Just this morning we announced that our Tweed Farms
>   facility in Niagara-on-the-Lake will house a million square feet of
>   greenhouse space – tripling the current size, which is already the largest
>   legal cannabis greenhouse in the world. **Our focus going forward will be
>   to fill store shelves, and to do that we will continue to expand our
>   footprint in Ontario, across the country, and around the world.**

33.     On June 28, 2018, Canopy filed an Annual Report on Form 40-F with the SEC,

with a related Annual Information Form, Consolidated Financial Statements, and a

Management's Discussion and Analysis of the Financial Condition and Results of Operations of

the Company ("MD&A") appended as exhibits thereto, reporting the Company's financial and

operating results for the quarter and year ended March 31, 2018 (collectively, the "2018 40-F").

For fiscal 2018, the 2018 40-F reported a net loss of C$70.35 million,[2] or C$0.40 per diluted

share, on revenue of C$77.95 million, compared to a net loss of C$7.52 million, or C$0.06 per

diluted share, on revenue of C$39.9 million for fiscal 2017.

34.     In discussing adjusted EBITDA, and with respect to International Financial

Reporting Standards ("IFRS") non-cash accounting related to biological assets and inventory, the

2018 40-F reported fair value changes in biological assets included in inventory sold and other

inventory charges of C$66.27 million for fiscal year 2018, compared to $C34.98 million for

---

[2] All references to "C$" signify figures in Canadian dollars.

fiscal year 2017, and unrealized gain on changes in fair value of biological assets of C$(100.30) million for fiscal year 2018, compared to C$(49.09) million for fiscal year 2017.

35.    The 2018 40-F also touted increased inventories of Canopy's cannabis products that were being scaled to meet projected market demands due, in part, if not entirely, to the legalized recreational cannabis market expected in calendar year 2018.   For example, in discussing fourth quarter 2018 revenue and operational highlights, the 2018 40-F stated, in relevant part:

> At quarter end the Company held inventory of 15,726 kilograms of dry cannabis, 6,969 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 356 kilograms softgel capsules., [*sic*] ***inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018***.

36.    The 2018 40-F also touted the increased total quantity of cannabis sold during the year, how this was part of a growing pattern of increased cannabis sales, how the Company expected a significant revenue stream from cannabis oil sales (including gel caps), and how all of the foregoing drove the Company's revenue for the current year, stating, in relevant part:

> Total revenue for the year ended March 31, 2018 was $77,948 representing a 95% increase over the year ended March 31, 2017.
>
> The Company believes the sale of cannabis oils will represent a significant revenue stream going forward. In the year ended March 31, 2018 and 2017, oils, including gel caps, accounted for 22% and 12% of product revenue, respectively.
>
> The total quantity of cannabis sold during the year ended March 31, 2018 was 8,708 kilograms and kilogram equivalents at an average price of $8.24 per gram, up from 5,139 kilograms and kilogram equivalents at an average price of $7.40 in same period last year due to an increasing mix of oil products and oil-based soft gel caps being sold as well as the increasing Germany sales.

37.    With respect to Canada's legalization of a regulated recreational cannabis market, the projected financial benefits of this new regulatory regime for Canopy, and the limitations it would impose on the Company's business, the 2018 40-F stated, in relevant part:

> *CIBC World Markets reports estimates of the potential value of the regulated recreational cannabis market in Canada range from $5.0 billion to $10.0 billion per year. The lower market value of $5.0 billion per year translates into yearly consumption of 770,000 kilograms of cannabis, assuming a price of approximately $6.50 per gram.[] To put the potential size of the Canadian regulated recreational market in context, Statistics Canada valued the beer market in Canada, in 2014, at $8.7 billion.[]*

> [. . . .] The Government is targeting implementation over eight to twelve weeks. As expected, Canadian Licensed Producers ("LP"), which currently supply the medical marijuana market, will also be responsible for supplying marijuana to the regulated recreational market.

> Canopy Growth looks forward to continued discussion on this topic as regulations are developed. *The legislation does not prescribe specific limitations other than details on overly promotional language or targeting youth.* [. . . .]

> Federal legislation, once created, will enable provinces to distribute and retail Cannabis. Each Canadian province and territory is preparing for the sale and distribution of cannabis for regulated recreational. *Management believes that the revenue generating opportunities and economic development potential of the control and sale of cannabis for regulated recreational is not lost on provinces.*

> At the onset of the regulated recreational cannabis market, permitted products will be the same as what is currently offered in the medical cannabis market – dried flowers, oils and soft-gel.  As this product offering represents only a portion of the products available on the illicit market, *the federal government has indicated that value-added products including higher concentrated oils and ingestibles will be permitted for sale within a year of the opening of the regulated recreational cannabis market*.

38.    The 2018 40-F also discussed Canopy's strategic positioning for the Canadian regulated recreational market, touting that the Company had secured a plethora of channels to market, had prepared desirable levels of inventory for capitalizing on the recreational market, had partnered with local licensed producers for more value-added consideration, and that the Company's renowned brand of products had uniquely positioned Canopy for profitability. Specifically, in this regard, the 2018 40-F stated, in relevant part:

> *Management has invested significant effort in securing channels into the future regulated recreational markets across Canada.* With the provincial liquor agencies being given responsibility for establishing distribution and retail

frameworks focused the majority of its management outreach on building relationships with these agencies. ***To aid in this effort, the Company hired a government relations team with significant direct liquor agency experience.***

It is worthwhile noting that the Company has engaged in outreach to other retail networks including national pharmacy chains in Canada. [. . . .]

* * *

***To position the Company to confidently secure primary supplier contracts with all of the provincial liquor agency, the Company has invested significant resources to establish the largest cannabis inventory and in-production licensed capacity by early calendar 2018.*** At March 31, 2018, management believes the Company had the largest inventory of harvested product and biological assets ***with a value exceeding $118,000***. As of June 27, 2018, management believes the Company has the largest licensed and in production platform in Canada, at over 2.4 million sq. ft. In addition, the Company expects to have up to an additional 3.2 million sq. ft. to enter production over the next year ended. ***With the combination of the sector's largest inventory and the Company's vast production platform, management believes the Company is well positioned to secure large supply channels into the regulated recreational market and ultimately supply a significant portion of that market.***

The Company's CraftGrow program . . . which assists smaller local/regional Licensed Producers in getting their product to market, provides additional value-added consideration should provincial liquor control agencies seek the flexibility to showcase products of local/regional Licensed Producers within a trusted supply agreement with a larger producer.

With renowned cannabis brands (Tweed, Leafs By Snoop & DNA Genetics), strong customer and online communication, substantial product variety, investment in the development and execution of marketing, and retail programs and investment in a business to business sales function, ***management believes consumer demand for the Company's products will be strong***.

39.    The 2018 40-F further touted Canopy's position as a market leader with the largest customer base in the legal Canadian cannabis market, while asserting that it would leverage its "significant consumer product demand intelligence" and industry knowledge to assist and work with provincial regulatory bodies, corporations, and retailers.  Specifically, in this regard, the 2018 40-F stated, in relevant part:

With licensed cultivation and production operations in Ontario, Saskatchewan, Quebec and British Columbia as well as announced development plans spanning Alberta, New Brunswick and Newfoundland & Labrador, ***Canopy Growth has made meaningful economic development commitments in various provinces. Management believes that economic development commitments will be one of the many factors that influence cannabis supply related decisions made by the provinces.***

[. . . .] ***With the largest customer base in the legal Canadian cannabis market and broadest product portfolio in the sector, the Company can offer provincial agencies/crown corporations/retailers <u>with significant consumer product demand intelligence</u> to assist with product selection.***

\* \* \*

Management believes the large product volumes that will shipped to the provincial and territorial agencies ***will require large capacity and increasingly efficient cannabis packing and shipping capabilities*** . . . . The Company is also investing significant resources in the research and development of automated systems.

40.     Additionally, the 2018 40-F touted Canopy's "development of a dedicated distribution centre" that "***has been designed to significantly increase the capability and <u>flexibility</u> of the company's fulfillment resources***," indicating to investors that Canopy was not merely ramping up production and capacity, but doing so in a tactical manner with room to adjust inventories as needed.

41.     With respect to Canopy's calculation of its cost of sales as it related to the Company's inventory, the 2019 40-F stated, in relevant part:

During the three months ended March 31, 2018, the Company harvested 4,811 kilograms. In comparison, during the three months ended March 31, 2017, the Company harvested 1,980 kilograms. ***The Company is ramping up production and inventories for later in calendar 2018 when the legalized recreational market is expected to commence to meet expected demand from consumers and the provinces.***

The net cost of sales of $15,629 during the three months ended March 31, 2018 was comprised of inventory production costs expensed to cost of sales of $14,289, fair value changes in biological assets included in inventory sold and other inventory charges of $19,929 offset by the unrealized gain on changes in the fair

value of biological assets of $18,589. The impact of changes in the fair value of biological assets recorded during the quarter was due in large part to the full utilization of Tweed Farms in Niagara-on-the-Lake and part utilization of BC Tweed offset by a lower amount of biological assets at Smiths Falls, Ontario as 7 of the 24 flower rooms at that facility were re-purposed, for clone propagation for other sites and the preparation of a large footprint pre-pack room, which reduced growing capacity for commercial harvest. [. . . .]

The inventory production costs expensed to cost of sales of $14,289 is principally comprised of the cash costs of the inventory sold in the period of $8,397 and $5,892 of cash operating costs of subsidiaries not yet cultivating or selling cannabis, such as BC Tweed, Vert Mirabel, Tweed 53 (Edmonton, Alberta) and Spot Therapeutics (Fredericton, New Brunswick). This compares to the same period last year when the inventory production costs expensed to cost of sales of $5,603 was comprised of the cash costs of inventory sold in the period of $5,514 and $89 of cash operating costs of subsidiaries not yet cultivating or selling cannabis.

42.     With respect to the effect that Canopy's cost of sales and other inventory charges had on gross margin, the 2018 40-F stated, in relevant part:

The fourth quarter Fiscal 2018 gross margin before the effects of IFRS fair value impacts in cost of sales and other inventory charges, and excluding the costs of non-cultivating subsidiaries and assets, totaling $5,892, was $14,409 or 63% of sales.

The fourth quarter Fiscal 2018 gross margin before the effects of the IFRS fair value impacts in cost of sales and other inventory charges was $8,517 or 37% of sales, as compared to $9,058 or 62% of sales in the fourth quarter of last year. The lower gross margin percentage was due primarily to the impact of cash operating costs of subsidiaries not yet cultivating or selling cannabis, described earlier in this MD&A.

The IFRS reported gross margin was $7,177 or 31% of revenue, for the three-month period ended March 31, 2018. In the comparative period ended March 31, 2017, the gross margin on the same basis was $2,499 or 17% of revenue. Gross margin includes the fair value changes in biological assets included in inventory sold and other inventory charges and unrealized gain on changes in fair value of biological assets.

43.     With respect to inventory's impact on Canopy's liquidity, the 2018 40-F stated, in relevant part:

The increase in total working capital to $389,749 (March 31, 2017 - $154,941) was primarily due to [among other factors] the increase in inventory . . . .

\* \* \*

At March 31, 2018, inventory quantities amounted to 15,726 kilograms of dry cannabis. Of this amount, 2,982 kilograms was finished goods available for sale; 3,480 kilograms of product in process of testing and awaiting release for sale, and 9,264 kilograms of extract-grade cannabis held for conversion to oils and capsules. This compares to March 31, 2017 when a total of 8,360 kilograms of dry cannabis was in inventory, comprised of 377 kilograms of finished goods, 3,173 kilograms of product awaiting approvals to be released for sale, and 4,810 kilograms of extract-grade cannabis being held for conversion to oils and to capsules. In addition, the Company had a total of 6,969 litres of cannabis oil, ranging from concentrated resins, or refined oil, to oil in its finished state and available for sale, up from 1,799 litres held at March 31, 2017, also ranging from concentrated resins to finished oils available for sale.  The Company also had 356 kilograms of capsules on hand at March 31, 2018.

Inventory at March 31, 2018 amounted to $101,607 (March 31, 2017 - $45,981) and biological assets amounted to $16,348 (March 31, 2017 - $14,725), together totaling $117,955 (March 31, 2017 - $60,706) *all of which Management believes is required to meet expected market demands, including the legalized recreational market expected later in calendar 2018*.

The increase in inventory since March 31, 2017 was due to the new grow rooms coming on line at Smiths Falls, having Spectrum operations integrated and online, and the harvests at the Company's greenhouse in Niagara-on-the-Lake. Harvested plants were added to inventories during the quarter and quantities maintained to meet the growth in sales expected and meet strain availability requirements, and the expansion of oils.

44.    Appended as exhibits to the 2018 40-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Linton and Saunders certified that "[t]he [2018 40-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in this [2018 40-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

15

45.     On June 26, 2019, Canopy filed an Annual Report on Form 40-F with the SEC, with a related Annual Information Form, Consolidated Financial Statements, and MD&A appended as exhibits thereto, reporting the Company's financial and operating results for the quarter and year ended March 31, 2019 (the "2019 40-F"). For fiscal year 2019, the 2019 40-F reported a net loss of C$685.44 million, or C$2.57 per diluted share, on revenue of C$226.34 million, compared to a net loss of C$70.35 million, or C$0.40 per diluted share, on revenue of C$77.95 million for fiscal year 2018.

46.     In discussing adjusted EBITDA, and with respect to IFRS non-cash accounting related to biological assets and inventory, the 2019 40-F reported fair value changes in biological assets included in inventory sold and other charges of C$129.54 million for fiscal year 2019, compared to a restated amount of $C67.86 million for fiscal year 2018, and unrealized gain on changes in fair value of biological assets of C$(167.55) million for fiscal year 2019, compared to a restated amount of C$(96.72) million for fiscal year 2018.

47.     In discussing fiscal year 2019 operational and financial highlights, the 2019 40-F touted the total quantity of Canopy's recreational cannabis sold, an increased total quantity of cannabis sold generally (the majority of which was purportedly made up of recreational cannabis sales in Canadian provinces), and an increased total quantity of cannabis harvested, while acknowledging that the average price at which such quantities were sold had decreased from fiscal year 2018. Specifically, the 2019 40-F stated, in relevant part:

> The total quantity of cannabis sold during fiscal 2019 was 24,320 kilograms and kilogram equivalents at an overall average price of $7.91 per gram, up from 8,708 kilograms and kilogram equivalents in fiscal 2018 but down from $8.24 per gram in fiscal 2018. The increase in kilogram and kilogram equivalents sold was due to the launch of the Canadian recreational market on October 17, 2018.
>
> Recreational cannabis accounted for 16,250 kilogram and kilogram equivalents sold in fiscal 2019 (67% of total cannabis sold), of which 84% was sold directly

to the Canadian provinces and the remainder through our direct retail and on-line consumer channels. [. . . .]

The average selling price per gram, net of excise tax, was $7.91 in fiscal 2019, a decline from $8.24 in fiscal 2018 due primarily to the wholesale pricing which we realized when selling to the provincial crown corporations in the recreational market, partially offset by the higher average pricing realized in the retail channel.

We harvested 46,927 kilograms of cannabis in fiscal 2019, as compared to 22,513 kilograms harvested in fiscal 2018. The increase is attributable to the build-out of our production capability over the last fiscal year in preparation for the launch of the Canadian recreational market.

48.     With respect to Canopy's revenue from recreational cannabis sales, the 2019 40-F touted that "[r]ecreational revenue in fiscal 2019 was $140,532, with the increase from fiscal 2018 entirely due to the launch of the Canadian recreational cannabis market in October 2018," and that "[o]ils, including [Canopy's] softgel capsules, accounted for 23% of net revenue in fiscal 2019."

49.     With respect to Canopy's cost of sales as it related to the Company's inventory, the 2019 40-F stated, in relevant part:

Inventory production costs expensed to cost of sales in fiscal 2019 were $175,425, as compared to $40,213 in fiscal 2018. In fiscal 2019, these costs were primarily comprised of the costs of recreational and medical cannabis sold in the period, and operating costs related to the operating costs of facilities which were not yet fully cultivating or had unutilized capacity, including the Delta greenhouse, a number of zones at the Aldergrove greenhouse, the Mirabel greenhouse which was in a pilot phase for the majority of the fiscal year, and the greenhouse in Fredericton, New Brunswick which was in a start-up phase.

The impact of changes in the fair value of biological assets in fiscal 2019 was due in large part to the commencement of growing at Mirabel, increased utilization at our greenhouses in Aldergrove and Delta, and new grow rooms at Smiths Falls.

50.     With respect to Canopy's gross margin before fair value impacts in cost of sales on a non-IFRS basis, the 2019 40-F stated, in relevant part:

Gross margin before fair value impacts in cost of sales for fiscal 2019 was $50,916, or 22% of net revenue. Comparatively, in fiscal 2018 gross margin

before fair value impacts in cost of sales was $37,735, or 48% of net revenue. The lower gross margin percentage in fiscal 2019 was primarily attributable to the impact of operating costs of $49,564 relating to facilities not yet cultivating or which had unutilized capacity, the lower average wholesale selling price in B2B channels in the recreational market, and absorbing early costs associated with developing and testing edibles and beverages for introduction later in calendar 2019. At our greenhouse facilities in Aldergrove, Delta and Mirabel, we have the ability to plant in a manner that allows for ongoing harvests, rather than one large harvest; ***this will allow for the increased utilization of assets for post-harvest processes and provide for a steady supply of product going forward***.

51.   With respect to gross margin on an IFRS basis, the 2019 40-F stated, in relevant part:

The IFRS reported gross margin for fiscal 2019 was $88,930 or 39% of net revenue, as compared to $66,595 or 85% of net revenue in fiscal 2018.  The IFRS gross margin was impacted by operating costs associated with facilities that were not cultivating cannabis or that had unutilized capacity, as described above, and the destruction of plants in the second quarter of fiscal 2019 due to delays in infrastructure and regulatory approvals for post-harvest processing licences at our Delta greenhouse. These factors were partially offset by the impact of changes in the fair value of biological assets, as described above.

52.   Appended as exhibits to the 2019 40-F were signed SOX certifications, wherein Defendants Linton, Zekulin, and Lee certified that "[t]he [2019 40-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in this [2019 40-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

53.   The statements referenced in ¶¶ 30-52 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Canopy had exaggerated and/or overestimated the potential market for its products in Canadian retail stores; (ii) as a result, Canopy had failed to properly account for inventory and

demand for its products, leading to inventory write-offs and restructuring charges; (iii) all of the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

54.     On November 14, 2019, Canopy announced its financial results for the second quarter of fiscal year 2020, which ended on September 30, 2019.  Among other results, the 2Q20 Press Release reported revenue that fell below the lowest analyst estimate and an EBITDA loss of C$155.7 million, which one analyst described as "astounding."  The 2Q20 Press Release further advised investors that it was unlikely to meet its previous revenue guidance of C$250 million by the fiscal fourth quarter.  As explained by Canopy's CEO, Zekulin, "provinces have reduced purchases to lower inventory levels, retail store openings have fallen short of expectations, and Cannabis 2.0 products are yet to come to market."  The 2Q20 Press Release further advised that, "[a]s part of a management-initiated portfolio review, the Company has taken a restructuring charge of $32.7 million for returns, return provisions, and pricing allowances primarily related to its softgel & oil portfolio"; "recorded an inventory charge of $15.9 million to align the portfolio with the new strategy"; and that "[t]he Q2 2020 gross margin impact of the portfolio restructuring costs is $40.4 million."

55.     Later that day, Canopy hosted an earnings call with analysts to discuss Canopy's results for the second quarter of fiscal year 2020.  On that call, Defendant Zekulin elaborated on the Company's disappointing financial results, pinning the blame on the Canadian government's slow rollout of sufficient retail stores, which had effectively reduced Canopy's expected

Canadian cannabis market by half.  For example, Defendant Zekulin, in his prepared remarks, stated, in relevant part:

> I think it is fair to say it's been a challenging couple of quarters in the cannabis sector. So I would like to first address that head on. [. . . .]
>
> So, firstly, the big picture. To be clear, there is still an emerging global cannabis opportunity worth hundreds of billions of dollars across medical, pharmaceutical, CBD and recreational cannabis. However, we know the bellwether remains what is happening in the Canadian recreational market. It is the first national federally legal large-scale market opportunity for the sector to execute upon. ***And the market opportunity today is simply not living up to expectations and at the risk of oversimplifying the inability of the Ontario government to license retail stores right off the bat has resulted in half of the expected market in Canada simply not existing.***
>
> ***Ontario represents 40% of the country's population yet has one retail cannabis store per 600,000 people. When one year into the market the addressable market is nearly half what is expected, there is going to be meaningful short-term problems.*** So, as a company, we are pleased to see the recent announcement that Ontario has made a commitment to move towards an open allocation of retail licenses where the number of stores will only be limited by market demand. This is a big deal but it cannot come soon enough.
>
> ***There is sufficient supply for an orderly store rollout to happen now as it did in Alberta over the past year and until this happens the cannabis sector cannot reach its full sales potential and cannot convert consumers from the illicit market into the legal market.*** [. . . .]

56.     Defendant Zekulin also disclosed that there had been a consequential negative impact from provincial buyers and the recreational channel as those entities attempted to "rightsize" their own inventory because of significant levels of inventory accumulation:

> Now as has been covered by many of you on this call, ***we have witnessed a slowdown by provincial buyers and the recreational channel as they rightsize their own inventory levels after significant inventory accumulation***. [. . . .]
>
> [. . . .] [A]fter a detailed business review, we have concluded that it is appropriate to reflect returns, return provisions and inventory adjustments . . . .
>
> [. . . .] Obviously, these abnormal restructuring items had a distorting impact on our gross margin to the tune of $40.4 million. [. . . .]

57.     On this news, Canopy's share price fell $2.66 per share, or 14.38%, to close at $15.84 per share on November 14, 2019.

58.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Canopy securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Canopy securities were actively traded on the NYSE, OTC, and TSX.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Canopy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Canopy;

- whether the Individual Defendants caused Canopy to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Canopy securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

65.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Canopy securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, OTC, and TSX and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Canopy securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

66.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

67.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

68.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

70.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Canopy securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Canopy securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

71.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Canopy securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Canopy's finances and business prospects.

72.     By virtue of their positions at Canopy, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

73.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Canopy, the Individual Defendants had knowledge of the details of Canopy's internal affairs.

74.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Canopy.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Canopy's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Canopy securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Canopy's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Canopy securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

75.     During the Class Period, Canopy securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Canopy securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Canopy securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Canopy securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

76.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

78.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79.     During the Class Period, the Individual Defendants participated in the operation and management of Canopy, and conducted and participated, directly and indirectly, in the conduct of Canopy's business affairs.  Because of their senior positions, they knew the adverse non-public information about Canopy's misstatement of income and expenses and false financial statements.

80.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Canopy's financial condition and results of operations, and to correct promptly any public statements issued by Canopy which had become materially false or misleading.

81.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Canopy disseminated in the marketplace during the Class Period concerning Canopy's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Canopy to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Canopy within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Canopy securities.

82.     Each of the Individual Defendants, therefore, acted as a controlling person of Canopy.  By reason of their senior management positions and/or being directors of Canopy, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Canopy to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Canopy and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

83.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Canopy.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 11, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _____Steven Bosco_____, make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Canopy Growth Corporation ("Canopy" or the "Company")

and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Canopy securities at the direction of plaintiffs counsel, or in order to

participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a class of investors who purchased or

acquired Canopy securities during the class period, including providing testimony at deposition and trial, if

necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this

action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Canopy

securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as

set forth in the Complaint, beyond my pro-rata share of any recovery, except such reasonable costs and

expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed    11-15-2019
               **(Date)**

**(Signature)**

Steven Bosco

**(Type or Print Name)**

**Canopy Growth Corporation (CGC)**                                                    **Bosco, Steven**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 4/22/2019 | Purchase | 11 | $45.3500 |